## STATE v EMONDS

Ohio Common Pleas, Cuyahoga Co

Decided March 25, 1938

Frank T. Cullitan, Prosecuting Attorney, Cleveland, for state of Ohio.

Martin A. McCormack, Cleveland, for defendant.

## OPINION

By HERTZ, J.

This matter is before the court after a plea of guilty of manslaughter on an application to suspend sentence and to place the defendant on probation in the manner provided by law.

Careful search for a discussion by the courts of when probation is to be granted or denied has revealed none. An inquiry, however, into the theory and rationale of probation is impelled both by the character of this defendant and the circumstances of his offense. These considerations together with widespread misconception of what probation is and what it seeks to accomplish, prompt a formal statement by the court.

The defendant was charged with having brought about the death of one James Beebe by stabbing. The evidence seems to establish that the victim, Beebe and his three companions had been aggressors in annoying and worrying the defendant. Finally after Beebe had kicked and punched Emmons, and the latter had retreated in vain, he thought himself surrounded by his antagonists. In a frightened effort to save himself from a peril which he overestimated, he resorted to the use of a knife in his possession as a means of effecting his escape and Beebe receiving a mortal wound.

The plea was entered on December 6, 1937. Sentence, however, was passed pending report by the probation department and by Dr. Royal S. Grossman, director of the Phychiatrist Clinic of this court. The defendant was ordered held in the county jail where he has been detained ever since that date.

That the court may place the defendant on probation after a conviction for manslaughter is now generally accepted. See 1931 Opinions of the Attorney General, No. 3336. In this county alone in 1936, fourteen cases and in 1935 sixteen cases were referred to the probation department following conviction for manslaughter. Cursory examination of the department's records reveals at least six instances of voluntary manslaughter where probation was granted with success. During the current term of court in this county a defendant who had killed his wife was placed on probation.

Sec 13452-1, GC, reads as follows:

"In prosecutions for crime, except as mentioned in §6212-17, GC, and as hereinafter provided, where the defendant has pleaded, or been found guilty and it appears to the satisfaction of the judge or magistrate that the character of the defendant and the circumstances of the case are such that he is not likely to again engage in an offensive course of conduct, and the public good does not demand or require that he be immediately sentenced, such judge or magistrate may suspend the imposition of the sentence and place the defendant on probation in the manner provided by law, and upon such terms and conditions as such judge or magistrate may determine; provided that juvenile delinquents shall not be included within this provision."

By virtue of this provision the court is granted discretionary powers which he may exercise only in constant mindfulness of the public good.

The court must choose in his desire to protect the community, between two courses. He may commit the defendant to the penitentiary or he may suspend sentence and place the defendant on probation.

The first course has one conceded and two alleged but doubtful virtues. Unquestionably while the defendant is confined, his opportunities for injuring others are restricted. It is also claimed, however, that imprisonment "teaches him a lesson", "gives him a chance to think it over" and "makes a man of him." Of that there is no substantiating evidence. Whatever data we have, proves to the contrary. Similarly as to the second virtue claimed for imprisonment, that it deters others. As early as in Blackstone's days, the value of severity as a deterrent was challenged. In speaking of the one hundred and sixty offenses then punishable by death under the laws of England, he said:

"So dreadful a list, instead of diminishing, increases the numbers of offenders. The injured, through compassion, will often for-

bear to prosecute; juries through compassion, will sometimes forget their oaths, and either acquit the guilty, or mitigate the nature of the offense; and judges, through compassion, will respite one half of the convicts and recommend them to the royal mercy. Among so many chances of escaping, the needy and hardened offender overlooks the multitude that suffer; he boldly engages in some desperate attempt to relieve his wants or supply his vices; and if unexpectedly the hand of justice overtakes him, he deems himself particularly unfortunate in falling at last a sacrifice to those laws which long immunity has taught him to contemn."

The facts are so irresistible that the National Commission on Law Observance and Enforcement (the so-called Wickersham Commission) over the signature of such eminent jurists and scholars as Geo. W. Wickersham, Newton D. Baker, Roscoe Pound and others, reported as follows:

"1. We conclude that the present prison system is antiquated and inefficient. It does not reform the criminals. It fails to protect society. There is reason to believe that it contributes to the increase of crime by hardening the prisoner. We are convinced that a new type of penal institution must be developed, one that is new in spirit, in method and in objective."

Vol. III Reports—Natl. Comm. on Law Observance and Enforcement, p. 170.

Discussing the other alternative before the court, the same commission over the same signature in the same report, at page 173, says:

"16. Probation must be considered as the most important step we have taken in the individualization of treatment of the offender.

"* * *

"18. No man should be sent to a penal institution until it is definitely determined that he is not a fit subject for probation. To this end it is urged that every effort be made to broaden probation and provide more and better probation supervision. * * * It is clear that probation where it is applicable, is much less expensive and, from the social point of view, much more satisfactory than imprisonment."

Probation is a form of correctional treatment in which sense, it is punishment fully as much as imprisonment. It is not lenien-

cy. It is not a sentimental concession which gives "the defendant another chance." It is not a comfortable device for escaping the performance of an uncomfortable judicial duty.

Its defects are two. It is occasionally granted unwisely and ·sometimes without the necessary supervision. Its shortcomings are those of administration, not of principle.

Where, however, the cases are chosen wisely and the supervision is effective, it offers many advantages. It is economical for its cost is only a fraction of the cost of imprisonment. It conserves the earning power of the defendant for the benefit of his dependents and saves them from the charity rolls and the public from the burden of supporting them. It permits the defendant to make restitution to those he has wronged. Finally in the effort to re-and aims either to eliminate or cure what is good in his environment and character and aims either to eliminate or cure what is bad.

But most significant, is its relative success in protecting society. About eighty per cent of those placed on probation serve their terms successfully, both in this county and elsewhere, only four per cent of these every get into difficulty later.

In short, the case for probation may be summarized in the words of the late President Calvin Coolidge:

"Justice requires as strongly the saving of that which is good, as it does the destruction of that which is evil. The work that the probation officers are doing is saving of that which is good in the individual, along with the correction of that which is evil. Probation is the right hand in the administration of justice."

(Quoted as foreword to "Probation and Delinquency" by Edwin J. Cooley, Thos. Nelson & Sons, N. Y., 1927.)

The defendant, who is 47 years old, is one of eight sons and daughters of respected parentage. Although the other members of the family have never run afoul of the law, his difficulties began in Juvenile Court and reached a climax in 1921 when he was sentenced to the Ohio State Penitentiary for burglary and larceny. Since his release in 1924, he had led a law abiding and abstemious existence free from blemish as a motion picture projectionist at a salary of from $72.00 to $82.00 per week. All who have had occasion to learn about him, speak of him as quiet, earnest, industrious and dependable.

While a record of previous misconduct sometimes justifies the fear that offensive conduct will be repeated and therefore make probation unjustifiable, that presumption is not tenable here. Neither the background of his youth nor the character of his earlier offenses is related to the matter before us. The Emonds of 1921 and prior thereto, and the Emonds of 1924 and since, have little in common and the offenses of those days are totally dissimilar to the offense now under consideration. Seventeen years of successful self-adaptation to the requirements of society, moreover, argue convincingly that his past history has only collateral significance for us.

His first wife, to whom he was married in 1914, died in 1921. He was married again in 1926 and divorced from his second wife in 1936. Since then he has been paying her for the support of their eleven year old daughter and herself the sum of $90.00 per month. These payments were made regularly and conscientiously. Careful investigation of the background of the divorce to ascertain whether it might throw any light upon our problem, reveals nothing reflecting upon this defendant and nothing of any significance here.

Except for an impairment of hearing his physical examination revealed nothing noteworthy. The preponderance of the evidence indicates that his intelligence is normal. The psychiatric study, however, raised consideration which required careful investigation and thought.

The defendant was examined clinically and studied not only by Dr. Grossman of this court but also by Dr. S. Baumoel, a highly regarded neurologist and psychiatrist of this city who was invited into the case at the instance of the defendant's present employer. In addition the defendant was given certain of the newer tests which though offering great promise of future usefulness, as yet lack validation and complete scientific acceptance.

The Rohrschbach Test revealed emotional difficulties in the structure of his personality such as internal conflicts, anxieties and fears. We are unable, however to conclude from such findings that his conduct was unconsciously motivated. We have no assurance that the test did not reflect merely his prevailing mood in his present plight when adjusted individuals might reasonably succumb to similar emotional disturbances. Furthermore such a conclusion was negatived by the findings in the Bell Inventory Adjustment and the Minnesota Scale for the Survey of Opinions which showed superior emotional and social adjustments. Although the latter tests are based merely on verbalized attitudes, they are consistent with the clinical findings which not only specifically eliminate gross pathological factors, but find him a well-adjusted individual whose history revealed no vicious or violent temper reactions or tendencies.

Both psychiatrists conclude that the defendant is not likely to seek or to create another experience of like nature and that he can be counted upon to try to avoid any similar situation. Dr. Grossman, however, believes that if the defendant "were unavoidably forced into it we might in the future see a repetition." Such an unavoidable situation, however, would require a singular combination of circumstances which by the law of chance is so unlikely to occur that we may with safety minimize it. Certainly possibility must be distinguished from likelihood and the likelihood is too small to justify incarceration merely on that account. On the other hand, careful supervision and psychiatric treatment might even further minimize this risk which is already minimal.

On the whole we are of the opinion that the character of the defendant, as revealed by his life history and the psychiatrist studies which have been made, while not eliminating all possibility of trouble, in the future, justifies us nevertheless in saying "that he is not likely again to engage in an offensive course of conduct."

We address ourselves now to the circumstances of the case. Clearly this defendant must be distinguished from one who without provocation and of his own spontaneous conduct engages in a crime of violence. Had Beebe and his companions let him alone, Beebe would still be living and Emonds still winning his struggle to make good. There is nothing in the facts to indicate that Emonds in this crime ever intended to defy society or to hold human lives cheaply. On the contrary there is much to make us believe that his conduct was motivated largely by fear and partly by desire to avoid trouble. There is no reason in the facts as we have heard them to believe that Emonds' conduct in this offense reveals an anti-social attitude or habit.

The fact that the defendant is not likely again to engage in offensive conduct is however, not fully dispositive of our problem. The statute requires that we also heed other demands and requirements of the public good.

How that good may be served most effectually was pointed out by our Supreme Court speaking through Chief Justice Thos. W. Bartley as early as 1857 when he said: (emphasis his own).

"The **leading**, if not the sole object in the administration of criminal justice, is the **safety** and **protection** of the community and its several members. Criminal punishment is not inflicted as an **atonement** or expiation for crime; **that** must be left to the wisdom of an overruling providence. And the experience of the past ages has taught that crime is more effectually prevented by the certainty than by an **unreasonable severity** of punishment disproportionate to the turpitude and danger of the offense. Touching this subject, Blackstone in his Commentaries uses the following language:

"it is absurd and impolitic to apply the same punishment to crimes of different malignity. A multitude of sanguinary laws (beside the doubt that may be entertained concerning the right of making them) do likewise prove a manifest defect, either in the wisdom of the legislative, or the strength of the executive power. It is a kind of quackery in government, and argues a want of solid skill, to apply the same universal remedy, the **ultimum supplicium** to every case of difficulty'."

"The legitimate purpose of criminal punishment being the safety of the community and its individual members by preventing the commission of crime, it is the duty of the government to endeavor to reform rather than exterminate offenders. And experience has taught, that the objects of the criminal law are better attained by **moderate** but **certain** than by severe and excessive penalties." **Robbins v State, 7 Oh St 131,** at p. 170, 171.

The requirements of the public good as thus defined demand, first that we deny ourselves the luxury of moral wrath in dealing with offenders but comfort ourselves, if we must, with the recollection that vengeance belongs to the Lord. Second, that we remember that certainty of punishment may accomplish a deterrent purpose, but severity defeats that purpose by making conviction more difficult and by making men worse not better. And third, that in the performance of our duty to society, we remember that because felons must leave prisons as well as enter them, we give society only ephemeral protection unless our correctional methods leave them better than they were when we took them.

Our objective, therefore, should be to provide corrective punishment while avoiding unnecessary and purposeless severity. At the same time, we must act so as to preserve public respect and confidence in our legal processes by exhibiting sternness where its exhibition is indicated. The course we have chosen seems to accomplish these aims.

It should be noted that Emonds has been incarcerated for approximately three and one-half months in the county jail. Unavoidably that incarceration was accompanied by worry over his fate which in itself was punishment. During that period of time he did not know whether his detention would be brief or long, whether he would be placed on probation or sent to the penitentiary. It would seem that incarceration under such circumstances, accompanied by the mental torture that worry must have brought in its trail should go far toward accomplishing whatever good may be realized from that form of treatment.

Furthermore placing the defendant on probation does not permit him to escape punishment. To impress both the defendants and others with the seriousness of this offense and in this sense to accomplish punishment as rigorous and effective as imprisonment, the conditions of probation may exact pecuniary restitution and impose onerous restraints upon liberty.

Finally neither the defendant nor his crime is such as to shock the conscience of the community if he is placed on probation. He occupies no position of wealth or influence; he is in humble circumstances, and while his friends are loyal, they share his position in life. His crime affects directly only a small number of persons and it is fully as attributable to unfortunate coincidence as to choice on his part. Placing him on probation therefore in no wise endangers the prestige of our law-enforcing institutions.

The court therefore concludes that this case is one in which "the character of the defendant and the circumstances of the case are such that he is not likely again to engage in an offensive course of conduct, and the public good does not demand or require" that Emonds be sent to the penitentiary. We, therefore, in accordance with usual practice sentence him to

the Ohio State Penitentiary but suspend execution of the sentence and place him upon probation for five years, the maximum term.

The condition and terms of such probation shall, however, be as follows:

1. That Emonds abide by the usual rules, regulations and requirements of the probation department;

2. That, in accordance with arrangements between the mother of the deceased James Beebe and this defendant, the defendant pay to her the sum of $50.00 per month for five years for the purpose of contributing toward her support in lieu of that support which her son might have given her.

3. That the defendant continue as heretofore to comply with the order of the court in his divorce proceedings and pay to his former wife for the support of herself and their daughter, the sum of ninety dollars ($90.00) per month in accordance therewith.

4. That the defendant refrain from visiting in any way any public place where alcoholic beverages of any nature or kind are consumed upon the premises;

5. That the defendant make himself the patient of a psychiatrist of his own choosing but subject to the approval of the Phychiatric Clinic of this court, that he abide by the course of treatment to be prescribed by such psychiatrist, and submit to such psychiatric clinic quarter annual reports by his psychiatrist describing his progress and condition and providing such information as said clinic may require.

In the event of any wilful breach of these conditions the probation shall be terminated and the sentence to the penitentiary ordered into execution forthwith.